UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| ZOHAIR ALNABULSI | CIVIL ACTION NO. |
| Plaintiff, | October, Seventh, 2010 |
| V. | 310CV01591 JCH |
| FIRST UNUM LIFE INSURANCE COMPANY | |
| and the DAVID LERNER ASSOCIATES, INC | |
| GROUP LONG TERM DISABILITY PLAN | U.S. DISTRICT COURT NEW HAVEN, CT  2010 OCT -8 P 12:36  FILED |
| Defendants. | |

## COMPLAINT

## Nature of the Complaint.

Plaintiff, ZOHAIR ALNABULSI, brings this action against defendants First Unum Insurance Company (UNUM) and David Lerner Associates, INC Group Long Term Disability Plan, as administered by UNUM, for violation of the Employee Retirement Income Security Act of 1974, (ERISA) and any amendments thereto. Zohair Alnabulsi is a participant in the Plan, an ERISA welfare benefit plan that is underwritten and insured by First Unum Insurance Company and issued to David Lerner Associates, Inc.

This Complaint alleges the following violations of ERISA:

(1) UNUM's unlawful termination of Zohair Alnabulsi Long Term Disability benefits (LTD) without presenting medical evidence supporting its decision; (2) UNUM's unjustified disregard for opinions of Steven C. Levin, M.D, Joachim Baehring, M.D, Khalid Abbed, M.D, and Jahangir Maleki, M.D, treating physicians in an attempt to

deprive Mr. Alnabulsi's of the LTD benefits he is due; and (3) UNUM's failure to provide reasonable claims procedure that would yield a decision on the merits of Mr. Alnabulsi's claim.

Mr. Alnabulsi is filing this action to recover benefits under the plan, enforce his present rights existing therein, to clarify his rights under the terms of the plan, and to recover costs and attorney's fees as provided by ERISA.

## Jurisdiction, Venue, and Service of Process.

1. This Court has personal and subject matter jurisdiction over this case pursuant to ERISA, § 502(e)(2) and (f), 29 U.S.C. § 1132(e)(2) and (f) without regard to jurisdictional amount of diversity of citizenship, in that the plan is administered in this district.

2. Venue In this Court is proper under ERISA, § 502(e)(2), 29 U.S.C. § 1132(e)(2), in that defendant UNUM may be found in this district and the breach took place in this district.

3. Service of process is authorized in any district where a defendant resides or may be found, and UNUM can be found in the district of Connecticut. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## The Parties.

4. Zohair Alnabulsi is 47-years-old and resides in Guilford Connecticut. He is a participant in an employee benefit plan within the meaning of ERISA § 3(7), 29 U.SC. § 1002(7). Zohair Alnabulsi has standing to bring this action under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

5. Defendant UNUM is a for-profit corporation with its principal place of business at 99 Park Avenue 6th Floor, New York, New York. UNUM transacts business in Connecticut and insures and underwrites the plan under which Zohair Alnabulsi is suing. UNUM is the party responsible for processing claims made under the plan and making a final determination as to plan participants' eligibility for LTD benefits.

6. At all times relevant to the claims asserted in this Complaint, UNUM purported to act and did act as an ERISA claims fiduciary with respect to participants of the plan, and specifically, with respect to Zohair Alnabulsi, within the meaning of ERISA.

7. The plan under which Zohair Alnabulsi is suing is a disability insurance plan issued by UNUM to David Lerner Associates, Inc., a New York entity with its principal place of business in Syosset, New York. The policy number is 582237 022.

## Statement of Facts.

8. David Lerner Associates hired Zohair Alnabulsi in 2000 as an Investment Counselor. Over the years, Zohair Alnabulsi performed well at David Lerner Associates, Inc., rose through the ranks and eventually became a Senior Associate of the company.

9. The essential Job Functions of Zohair Alnabulsi at David Lerner Associates included the following :

- Develop client base by participating in ongoing prospecting: including cold calling, trade shows, face-to-face prospecting and networking.
- Evaluate clients' financial goals and investment tolerance by gathering current financial holdings (Suitability Profile).
- Analyze clients' financial profile including income, assets, investment or debts; determine which financial products best meet the client's needs and financial circumstances.
- Advise clients on what DLA financial products may meet their financial objectives and why.

    . Report to assigned branch each weekday unless on an appointment.

    . Provide on-going service to all clients.

    . Successfully meet the outside activity and commission levels set by branch management.

    . Fulfill continuing education requirements, and attend all sales meetings.

    . Participate in regularly scheduled in-house training sessions/ sales meetings.

10. David Lerner Associates Inc., terminated Zohair Alnabulsi's employment in November of 2008, and refused to maintain his employment on a part time basis, because of his disability.

11. Zohair Alnabulsi became insured under the plan in 2001.

12. The plan provides for payment of LTD benefits when an insured person becomes disabled.

13. The plan defines "Disabled" in the following ways:

    -you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury ; and

    -you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and

    -during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.

14.     Except for the definitions of "Disabled" quoted above, the Plan contains no other definition or explanation of what is meant by the terms "disability" or "disabled".

15.     The plan states that disability payments will be stopped only:

-when you are able to work in your regular occupation on a part-time basis but you choose not to;

-the end of maximum period of payment;

-the date you are no longer disabled under the terms of the plan;

-the date you fail to submit proof of continuing disability;

-the date your disability earnings exceed the amount allowable under the plan;

-the date you die.

16.     Zohair Alnabulsi has suffered from chronic back pain for many years. In 2001 he had disc surgery at L4-5. He required another operation at L5-S1 in August, 2008. That surgery was successful in relieving the pain Mr. Alnabulsi had been feeling in his buttocks, but did not relieve his low back pain.

17.     Furthermore, he awoke from the August, 2008 surgery with numbness in his right foot. Within a short period of time his symptoms began to increase. He began experiencing cramps in his right foot and it became extremely sensitive, even when merely touching it to another object. He also experienced "electric shock-like" sensations in his right foot.

18.     The quality of the pain varied between dull, "achy," and sharp. The medical records document that the intensity of the pain varied, but that the pain in the foot was always present. It varied from a low of three to a high of nine on a 1-10 pain scale.

Case 3:10-cv-01591-JCH   Document 1   Filed 10/08/10   Page 6 of 17

19. When his surgeon Dr. Abbed could not offer any further relief to Mr. Alnabulsi, he referred him to Dr. Joachim Baehring a neurological specialist and professor at the Yale University School of Medicine. Dr. Baehring in his January 27, 2009 report, diagnosed Mr. Alnabulsi with Complex Regional Pain Syndrome ("CRPS"), sometimes called Reflex Sympathetic Dystrophy.

20. Dr. Baehring recommended that Mr. Alnabulsi consult a chronic pain specialist, Dr. Steven Levin.

21. Dr. Levin's assessment was the following:

-Failed Back Surgery Syndrome vs. chronic radiculopathy

-Gait Disturbance

-Posture Abnormality

-Sleep Disturbance

-Work limitation-due to his pain he is only able to work part time

23. Under the direction of his doctors, Mr. Alnabulsi has attempted a variety of remedies in order to obtain some relief from his chronic pain. He underwent back surgery, followed by numerous medications, patches, injections and physical therapy.

24. The medications includes Neurontin, Lidoderm patches, Ultram, Tramadol, steroid injections, selective nerve root injections, Triptal, Elavil, Lyrica, Medrol, demerol, Percocet, Gabapentin, Methylprednisone, epidural injections, nerve blocks, Pregabalin and ESI.

25. Unfortunately, none of these therapies has been successful. Dr. Baehring recommended that Mr. Alnabulsi see a specialist at the Cleveland Clinic, Dr. Jahangir Maleki, MD PHD.

26. On March 31, 2010 Dr. Maleki Impressions after a Physical examination were:

-Lumbosacral radiculopathy with Complex Regional Pain Syndrome Type 2 (Causalgia),

-Myofascial pain,

-Spondylosis of spine with, Degenerative Disc Disease, Spinal Arthropathy and Foraminal narrowing,

-Migraine headache,

-Chronic pain with physical and psychological dysfunction.

27. Mr. Alnabulsi, hoping to return to work on part time basis, begged his employer David Lerner Associates. Inc., to permit him to work on a part time basis. Unfortunately, his employer refused to permit him to work on a part time basis.

28. After searching for many months, Mr. Alnabulsi was finally able to land a part time position in March, 2009.

29. Mr. Alnabulsi's compensation is based entirely on commission. In calendar year 2007, before the onset of his disability, he earned more than $146,000. Working as hard as he was able during calendar year 2009, he generated a total commission of $800. He actually lost approximately $4,000 after taking into account his expenses. For calendar year 2010 to date he is in deficit as well. In short, Mr. Alnabulsi has not simply suffered a diminution in his earnings; his ability to earn a living has been destroyed.

30. Mr. Alnabulsi was notified by UNUM on February 25, 2009 that his application for long term disability benefit had been approved.

31. On August 24, 2009, the decision granting these benefits was revoked. The sole reason provided was that the Functional Capacity Evaluation("FCE") ordered by UNUM had demonstrated that Mr. Alnabulsi was "physically capable of sedentary work over an eight hour day if sitting is limited to the frequent category and [he was] provided with the opportunity to interrupt sitting with

standing and provided with ergonomic seating." This "conclusion" was supported by the fact that Mr. Alnabulsi sat for 52 out of 60 minutes during a time when he was given the opportunity to sit or stand, with the examiner noting the maximum uninterrupted time of sitting was 13 minutes.

32. None of Mr. Alnabulsi's physical illnesses have improved since First Unum Life Insurance Company began paying him LTD benefits based on them.

33. On February 25, 2010, through attorney Patrick Noonan, Mr. Alnabulsi appealed UNUM's termination of his benefits. In support of his appeal, Mr. Alnabulsi's counsel include the following points:

   * There was no medical information between the time UNUM made the decision to grant benefits on February 25, 2009 and the revocation of those benefits a short six months later which would justify that revocation of benefits;

   * Far from proving that Mr. Alnabulsi is capable of working an eight hour day, the FCE actually supports the opinions of both of his physicians that his ability to sit at a desk is limited;

   * Even if he had been able to sit for the entire one hour, there is absolutely no basis in the record to conclude that Mr. Alnabulsi is capable of performing his work continuously for an eight hour day. It is simply fallacious for the examiner to assume that Mr. Alnabulsi would have been able to continue the same pace over an eight hour period as he had for a one hour period;

   * The examiner also demonstrated that he had no understanding of what a financial advisor must do during the course of a day;

   * Even assuming that Mr. Alnabulsi could physically sit at his computer for eight hours, his job requires that he do more than simply sit. A financial advisor's job is very taxing from a mental standpoint, and one must be able to concentrate on such diverse subjects as collecting and analyzing clients' financial information, determining the risk tolerance of clients and prospective clients, studying investment products and opportunities, explaining the intricacies of

various investments to clients, meeting with clients in the office, and completing paperwork related to investments;

   *   It is pure fantasy to state that financial advisor can build a successful practice by sitting at his desk eight hours a day.   The uncontradicted evidence in the record is that Mr. Alnabulsi spent four days out of the week out of his office. Financial advisors are paid on commission; they cannot earn any money without clients;

   *   Consequently, even if one could assume that Mr. Alnabulsi could sit at a desk for eight hours, he would have nevertheless sustained a loss of at least 90% of his income;

   *   It is simply not possible to build a successful practice by sitting at one's desk;

   *   It is for that reason that the job description from David Lerner Associates, Inc. lists as the very first "essential job function" the following: "Development of client base by participating in ongoing prospecting: Including cold calling, trade shows, face-to-face prospecting and networking."   The same job description goes on to state that the financial advisor must "successfully meet the outside activity levels set by branch management.";

   *   The need for this face-to-face contact was even more necessary in Mr. Alnabulsi's case once he was terminated from his employment with David Lerner Associates, Inc.   His contract with David Lerner Associates, Inc., barred him from contacting any of his existing clients for a full year after his termination in November, 2008.   Since his surgery took place in August of 2008, more than 15 months elapsed following the onset of Mr. Alnabulsi's disability before he could call any of his preexisting clients.   Thus, Mr. Alnabulsi has been faced with the prospect of building a new practice from scratch.   That simply cannot be done by sitting at a desk eight hour a day.   Indeed when Mr. Alnabulsi had thriving practice, he spent 80% of his time outside the office;

   *   There is nothing in the record which UNUM accumulated in an effort to deny Mr. Alnabulsi's benefits which establishes that the face-to-face prospecting

and seminars are not part of the "material and substantial duties" of a financial advisor. With regard to seminars, UNUM's Marie Sullivan commented in a note dated August 24, 2009 that "standing at seminars would fall within the 'occasional standing' that was noted in the FCE and OCC clarification." To the contrary conducting the seminars was an integral part of Mr. Alnabulsi's job, and greatly enhanced his client base. Ms. Sullivan's statement that this would only require "occasional standing" is without any factual support. To the contrary, Mr. Alnabulsi's affidavit establishes that he would be expected to stand between an hour and two hours during such seminars;

* There seems to be a suggestion that since the seminars are not arranged every week, Mr. Alnabulsi could "store up" his ability to stand and use it all during a single seminar. Of course, such a suggestion is preposterous;

* Another fundamental problem with UNUM's review in this case that did nothing to examine Mr. Alnabulsi's disability due to his chronic pain syndrome. As established in the medical reports and in Mr. Alnabulsi's affidavit, the reason for Mr. Alnabulsi's inability to work at his previous level has less to do with his physical limitations (in terms of his ability to engage in particular activities) than his chronic, constant, unrelenting pain;

* As any pain specialist would appreciate, chronic pain is very debilitating. As in Mr. Alnabulsi's case, it keeps patients awake at night which in and itself makes it difficult for patient to work full time the following day particularly in a job which requires a great deal of concentration;

* Mr. Alnabulsi's medical record, as well as his interview with Mr. McCarthy, establishes that he suffers from an inability to sleep, awakening two to three times each night and has difficulty returning to sleep. As result when he awakens in the morning, he is not well-rested;

* He also typically awakens with a significant amount of pain in his back, right leg and, right foot. He takes his medications and when they begin lessen the pain, he can work for an hour or two. He then has to take more medication and lie down;

   *   As is true of other chronic pain victims, Mr. Alnabulsi suffers from an inability to concentrate for long periods at a stretch.   This explains why he must take frequent, lengthy breaks;

   *   There is absolutely no evidence in the record assembled by UNUM to contradict the statements of Mr. Alnabulsi and his doctors that he has experienced <u>constant</u> pain since his surgery of August of 2008;

   *   There is also absolutely no evidence to contradict the fact that this condition has completely destroyed his ability to earn a living;

   *   Even if Mr. Alnabulsi were physically able to sit, walk and drive without any restriction, and even if none of those activities were integral part of his job, the fact is that working ten hours a day in a focused and concentrated manner is one of the "material and substantial duties" of his occupation.   The complications he has suffered since his surgery in August, 2008 have prevented him from working at that level, a fact that is completely undisputed in the UNUM record;

   *   It is also undisputed that Mr. Alnabulsi has suffer a greater than 20% loss in his monthly earnings.   In fact, his loss has been 100% of his earnings.   Under these circumstances, his long term disability benefits should be restored.

   34.   On May, 2010 UNUM responded to Mr. Alnabulsi's February, 2010 appeal letter, and stated that "We have concluded that Zohair Alnabulsi is able to perform the duties of his occupation and he no longer meets the definition of disability in accordance with the long term disability and Waiver of Life Insurance Premium policies."

   35.   UNUM argued that, " On many visits, he has rated his pain as 3 out of a 10, 10 being the worst, which is considered the lower end of the spectrum and would not be expected to impair function."   The medical records documents that Mr. Alnabulsi's pain level ranges from 3 to 9 from a scale of 1 to 10, and on many doctor's visits reported a pain level of 6 at the time of the visit, and other visits a pain level of 3 as well.   UNUM in an effort to deny Mr. Alnabulsi's claim, emphasizes the number 3 pain level, implying that his pain level is at 3 constantly

so he can perform the material and substantial duties of his regular occupation for eight hour a day five days a week assuming that his pain level will not fluctuate and prevent him from performing his job. This is not consistent with Mr. Alnabulsi's pain pattern.

36. UNUM argued that "The medical records document that Mr. Alnabulsi has tried several medications that were ineffective. The records also reflect that he has tried medication such as Trileptal, which offered some relief but caused side effects such as blurry vision and headaches that improved with reduction in dosage. However, the medical evidence does not support that Mr. Alnabulsi remains on medications causing persistent adverse medication side effects." UNUM did not examine Mr. Alnabulsi's medical records to determine the cumulative effect of the various physical illnesses and the side effects of these medications, such as sleep disturbance, as documented in the medical records, increased episodes of migraines, blurry vision, constipation, and depression. UNUM also fails to acknowledge that Mr. Alnabulsi had worsening pain when he stopped the medication because of side effects.

37. UNUM argued that "On appeal a review of Mr. Alnabulsi's regular occupation was also completed. The vocational review was completed by a Senior Vocational Rehabilitation Consultant. The review concluded Mr. Alnabulsi's regular occupation calls for "Sedentary" level of physical exertion. The work typically requires frequent sitting, occasional periods of standing/walking, and occasional lifting/exertion of force of up to 10 lbs. While duly noting that this occupation typically requires significant "out-of-the-office" time spent prospecting and cultivating new clients and/or servicing existing clients, this level of activity does not expand the overall level of exertion of this occupation beyond the "Sedentary" level described above. The mere participation in driving activities, standing for 90-120 minutes at one time for presentations, meeting with clients at trade shows, or performing "cold call" activities would not require the claimant to perform work in excess of his established "Sedentary" level of work capacity."

The discription provided by UNUM suggests that a Financial Advisor sits at a desk, makes phone calls and simply closes a deal. In reality this is a much more complicated process. The cornerstone of a successful Financial Advisor practice is a successful prospecting approach. A Financial Advisor/Investment Counselor must contact prospects, meet with them, look at their financial portfolio and goals, discuss her/his recommendations, gain the prospect's trust before any sale can be generated. When Mr. Alnabulsi was working in his regular occupation with David Lerner Associates, Inc., more than 85% of his income originated from outside activities, and 80% of his time working was spent outside of the office driving, meeting with prospects/clients, conducting seminars, participating in trade shows, and making face-to-face contacts with businesses. These activities are not totally "sedentary" and require a significant level of physical and mental abilities. For example, while conducting a seminar in a restaurant or at a public facility Mr. Alnabulsi had to carry materials for handouts, giveaways, his laptop, a projector, and a projector screen. Furthermore he had to arrange for the networking hookups which requires bending, crouching and moving objects around, as well as moving tables and chairs around. After making sure the setup is in place, he had to meet and greet prospects, which requires extended periods of standing, then he had to present while standing, occasionally walking between tables to engage the audience for one to two hours. As a result of the complicated back surgery, and his postoperative back and leg pain, it is not possible for Mr. Alnabulsi to engage in these activities without his pain level escalating to a point that would prevent him from performing these substantial duties of his regular occupation.

38. UNUM argued that "The office-based components of Mr. Alnabulsi's work would be considered compatible with the use of fixed, raised workstation and an accompanying fixed raised work stool. The brief intermittent use of raised stool would also assist in breaking up periods of standing while attending trade shows and/or while giving group presentation." It seems that UNUM did not have full understanding of what activities a Financial Advisor should or must do in a trade show. Typically, a Financial Advisor participates in a trade show related to other industries, like a Boat Trade Show, Home Trade Show or a Medical Trade

Show. These trade shows usually last for a few days Mr. Alnabulsi's participation in such trade shows required him to rent a booth, and in most cases he would have to bring his own table, signs, brochures, and hand outs. Mr. Alnabulsi like many other Financial Advisors participating in these events, would then attract the viewers with giveaways and encourage them to register for a chance to win a prize, so he could get the chance to introduce himself, his services, and establish rapport hoping that this prospect would be interested in coming to a seminar or make an appointment with Mr. Alnabulsi to learn about the available financial products. He spent several hours on his feet talking to prospects while they are walking around in the exhibit, because it is unrealistic to expect the trade show attendees to come and talk to him while he is sitting at his booth.

39. UNUM stated: "We acknowledge that Mr. Alnabulsi has continued to report chronic pain following his surgery and we do not disagree that he continues to have restrictions and/or limitations as noted above that will be ongoing. However, these restrictions and/or limitations would not preclude him from performing the material and substantial duties of his regular occupation." When Mr. Alnabulsi underwent an FCE (functional capacity evaluation) arranged and paid for by UNUM, the physical therapist recommended ergonomic seating. While this may be feasible to arrange for the office, this will not be feasible in the above mentioned presentations and trade shows or when meeting with prospects/clients at their homes or place of business to discuss investment opportunities. Meeting with prospects and clients to explain the intricacies of various investments strategies, and to complete paperwork related to the investments could last from half an hour to up to three hours in some cases, while sitting on an available chair in a room of the clients' choice. Mr. Alnabulsi cannot bring his own ergonomic chair to the prospects/clients houses. In most cases Financial Advisors are thrilled at the opportunity to just land the appointment, hoping to impress the prospects/clients with his appearance and professionalism.

This is complicated further by Mr. Alnabulsi's limitation in wearing shoes for prolonged periods of time as a result of his foot sensitivity to touch, known by the medical term, "allodynia". It is not professional on his part nor will it be accepted by clients to see Mr. Alnabulsi take off his shoes when his foot pain escalates to a

point where he cannot tolerate keeping his shoes on, nor is it professional for him to wear sandals to these appointments and meetings.

40. UNUM's denial of Mr. Alnabulsi's LTD benefits disregards the opinion of his treating Physicians. Dr. Abbed stated on February 18, 2010 that: " I have been advised by Mr. Alnabulsi that his disability benefits have been terminated as of July 2009 as a functional capacity evaluation determined he was able to work full time. I would ask that additional consideration be given in this matter as Mr. Alnabulsi continues to have chronic pain symptoms requiring daily pain medications which impact his ability to concentrate and complete even basic daily activities." Dr. Steven Levin stated on February 23, 2010 that: "Mr. Alnabulsi is being treated for a chronic pain condition which is characterized by severe low back pain as well as severe neuropathic pain in his leg. As he continues to experience significant pain symptoms despite treatment, he is only capable of working part time with significant limitations." Dr. Joachim Baehring stated on February 15, 2010; " Unfortunately, in spite of treatment with steroid injections and neuropathic pain medications, Zohair's pain syndrome remains disabling. I proposed to obtain yet another consultation with a pain specialist. I am thinking of Jahangir Maleki who is running the pain center at Cleveland Clinic." Dr. Jahangir Maleki stated on March 31, 2010: "I had a detailed discussion instructing him about my findings and the necessity for comprehensive multidisciplinary management. Given the chronic nature, extend complexity and failure to respond to outpatient modalities of treatment, he is an appropriate candidate for an intensive Chronic Pain Rehabilitation program." UNUM was provided with all these documents.

41. Mr. Alnabulsi is unable to perform the duties of his occupation and he meets the definition of disability in accordance with the Long Term Disability and Waiver of Life Insurance Premium Policies.

## Count One: Enforcement of Plan Terms.

42. The Plan is a contract.

43. Mr. Alnabulsi has performed all of his obligations under the contract.

44.  ERISA § 502(a)(1) (B), 29U.S.C. § 1132(1)(B) states that: A civil action may be brought-

(1)  by a participant or beneficiary-

(A)  for the relief provided in subsection(c) of this section, or

(B)  to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

The UNUM's actions constitute an unlawful and/or arbitrary and capricious denial of benefits due under ERSA, as provided in ERSA § 502(a)(1)(B), § 1132(a)(1)(B).

50.  In accordance with ERSA § 502, 29 U.S.C. § 1132, Mr. Alnabulsi is entitled to be paid benefits under the Plan based on his disabled status, from the date his benefits were denied, and continuing into the future.

51.  UNUM has refused to provide Mr. Alnabulsi with these benefits and is, therefore, in breach of the terms of the plan and ERISA, which requires that UNUM engage in a full and fair review of all claims and the administration of the Plan in the best interests of the Plan participants.

52.  As direct and proximate result of this breach, Mr. Alnabulsi has lost the use of his rightful LTD benefits.

### Count Two: Attorney's Fees and Costs.

53.  Under the standards applicable to ERISA, Mr. Alnabulsi deserves to recover "a reasonable attorney's fee and costs of the action" herein, pursuant to ERISA § 502(g), 29U.S.C. § 1132(g).

54.  UNUM has the ability to satisfy the award.

55. Cessation of UNUM's conduct of this action is in the interests of all participants who subscribe to the Plan, and the relief granted hereunder will benefit all participants.

56. UNUM has acted in bad faith in denying Mr. Alnabulsi's benefits under the Plan.

57. The award of attorney's fees against UNUM will deter others acting under similar circumstances.

WHEREFORE, the Plaintiff respectfully prays that the court:

1. Declare, adjudge, and decree that Mr. Alnabulsi is entitled to past and ongoing LTD benefits as calculated under the terms of the Plan;

2. Award Mr. Alnabulsi the full amount of unpaid benefits under the Plan to which he is entitled, together with such pre-judgment interest as may allowed by law;

3. Order that UNUM make restitution to Mr. Alnabulsi in the amount of any losses sustained by Mr. Alnabulsi in consequence of the wrongful conduct alleged herein, together with pre-judgment interest;

4. Award Mr. Alnabulsi the costs of this action and reasonable attorney's fees; and

5. Award such other relief as court deems just and reasonable.

THE PLAINTIFF

BY/Zohair Alnabulsi

2 Covey Crossing

Guilford, CT 06437

(203)204-1150